UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-2 JOSE CASTRO-RAMIREZ,

    Defendant.
_____/

Case No. 09-20215

HONORABLE SEAN F. COX
United States District Judge

OPINION & ORDER RESOLVING OBJECTIONS
TO DEFENDANT'S PRESENTENCE INVESTIGATION REPORT

On March 11, 2010, a jury convicted Dr. Jose Castro-Ramirez ("Castro") on one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, eleven counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). [*See* Doc. No. 285]. The matter is before the Court for consideration of both parties' objections to the calculation of Dr. Castro's sentencing guidelines as calculated in the June 22, 2010 Revised Presentence Investigative Report ("PSR"). The parties have fully briefed the issues, and a hearing was held on August 18, 2010. For the reasons that follow, the Court **ADOPTS** the Government's lone objection [Doc. No. 338], **OVERRULES** Dr. Castro's objections [Doc. No. 347], and **HOLDS** that Dr. Castro's sentencing guidelines in the PSR are properly calculated as between 168 and 210 months.

BACKGROUND

On June 24, 2009, the grand jury returned an indictment charging Dr. Castro with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, eleven

individual counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). [*See* June 24, 2009 Indictment, Doc. No. 4].

On February 18, 2010, and again on February 22, 2010, the jury heard testimony from one of Dr. Castro's admitted co-conspirators, Mr. Shuresh Chand. Mr. Chand testified about the structure of the alleged health care fraud and money laundering conspiracies in which Dr. Castro participated, and also testified regarding the eleven individual health care fraud counts. The following is a summary of Mr. Chand's testimony.

Mr. Chand was a licensed physical and occupational therapist, and the owner of Continental Rehab Services, Inc. ("CRS"), a Michigan corporation that provided physical and occupational therapy to patients. Like other legitimate physical and occupational rehabilitation clinics, CRS would receive a patient referral from a doctor, provide physical or occupational therapy for the patient, and then bill Medicare or another health care provider for services rendered. Mr. Chand, thru CRS, had a legitimate business relationship with Dr. Castro for some time before the health care fraud conspiracy began, with Dr. Castro referring patients to CRS for physical or occupational therapy.

Beginning in 2003, however, Mr. Chand testified that CRS stopped performing legitimate business operations due to decreasing profitability. Along with two other physical and occupational clinics - Managed Care Physical Therapy and Rehabilitation Services, P.C. ("MCPT"), owned by Mr. Muhammad Azeem ("Azeem"), and S.U.B. Rehabilitation & Physical Therapy Center, Inc. ("SUB"), owned by Mr. Shafiulla Hanif ("Hanif") - Mr. Chand, Mr. Azeem, and Mr. Hanif conspired to defraud Medicare by creating fake patient treatment files and billing

Medicare for medically unnecessary and/or unprovided services.

Mr. Chand testified that successfully defrauding Medicare required a three-tiered conspiracy: Medicare patients were needed to provide their Medicare numbers and to sign documents, a doctor needed to sign documentation referring the patients to physical therapy clinics and to attest to the medical necessity of such treatment, and the clinics needed to sign documentation claiming that physical or occupational therapy was performed, and then bill Medicare for those services. Mr. Chand alleges that CRS, MCPT, and SUB were the clinics involved in the conspiracy. Mr. Chand, Mr. Azim or Mr. Hanif would recruit Medicare beneficiaries to be involved in the scheme. Dr. Castro was the doctor providing the referrals.

Mr. Chand testified that a typical transaction would work as follows. Mr. Chand would recruit a Medicare beneficiary to participate in the conspiracy. The patient would then come to Mr. Chand's offices at CRS, where Mr. Chand would have a host of forms ready for the patient to sign - sign-in sheets attesting to days of physical or occupational therapy performed, initial doctor's visit forms, and Medicare reimbursement forms attesting that services were actually rendered for the patient, to name but a few. In exchange, the patient would receive a nominal amount of money, and would provide Mr. Chand with a list of prescription drugs - Vicodin, Xanax, and Soma, for example - with resale value on the street that the patient wanted. Mr. Chand would then fax these lists of requested prescription drugs to Dr. Castro-Ramirez. Often without ever having met the patients, Dr. Castro would then write the requested prescriptions, and return the scripts to Mr. Chand, who would then give them to the patients.

With these forms signed by the patient, Mr. Chand's associates at CRS could then reverse-engineer entire files for that patient - both medical files for Dr. Castro as well as physical

and/or occupational therapy files for the clinics. Mr. Chand testified that his office computers at CRS had six medical history "templates" that CRS employees could use to fill out detailed therapy evaluations for the patients to make it appear that actual therapy services had been provided.

Completed physical and/or occupational therapy files still needed signatures from licensed therapy providers before they could be submitted to Medicare for reimbursement. Mr. Chand would have licensed therapy providers sit in a room and sign the necessary forms - such as the evaluation forms with the template-created patient histories, for example - in each therapy file. These therapists would often sign between fifty and a hundred such therapy files in a sitting, and Mr. Chand would pay the therapists between one hundred and one hundred and twenty dollars per file.

At that point, all Mr. Chand needed to complete the fraudulent files were signatures by a doctor on an initial evaluation, which referred the patient to one of the therapy centers, as well as Medicare forms 700 and 701 - required for Medicare reimbursement. Rather than bringing along the entire file for a patient, Mr. Chand would simply bring these three forms - the evaluation, 700 and 701 forms - to Dr. Castro's home, where Dr. Castro would sign forms in his garage for between thirty and fifty patients in a sitting - all, of course, without having first evaluated the patients and determining that physical and/or occupational therapy was medically necessary for the patients.

Mr. Chand specifically testified regarding eleven separate Medicare reimbursement files that his office produced as part of the alleged health care fraud scheme. These files - admitted as Government's Exhibits 34(j) through 34(t), each contain evaluations and Medicare 700 and 701

forms signed by Dr. Castro.[1]  For each of these files, despite signing the evaluation, 700 and 701 forms within those files, Mr. Chand testified that Dr. Castro did not evaluate any of those patients on the dates reflected in the files.  As such, Mr. Chand testified that these files did not reflect legitimate claims for reimbursement of actually-rendered services.

In exchange for his signatures on the evaluations and the Medicare 700 and 701 forms, Dr. Castro received two types of compensation.  First, Mr. Chand provided Dr. Castro with "routing slips" bearing patient signatures, which Dr. Castro could then use to bill Medicare for home health care visits with those patients, despite such visits not actually having been performed.  Second, Mr. Chand testified that he made monetary payments to Dr. Castro, amounting to more than $200,000.00 between 2004 to 2007.  Mr. Chand paid this money to Dr. Castro through personal checks drawn on Mr. Chand's own bank accounts.  Mr. Chand alleged that Dr. Castro was aware that these funds were the result of the health care fraud scheme, as Dr. Castro knew that Mr. Chand did not have any legitimate income source.

On March 11, 2010, a jury convicted Dr. Castro on one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, eleven counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). [*See* Doc. No. 285].  Dr. Castro's sentencing is currently pending before the Court.

---

[1] Specifically, Exhibit 34(j) relates to services allegedly provided to Ira Dickerson; Exhibits 34(k), (l), (m), and (n) relate to services allegedly provided to Cora Bynum; Exhibit 34(o) relates to services allegedly provided to James Cherry; Exhibit 34(p) relates to services allegedly provided to Betty Coleman; Exhibits 34(q) and (r) relate to services allegedly provided to Alice Gartrell; Exhibit 34(s) relates to services allegedly provided to Lewis Scott; and Exhibit 34(t) relates to services allegedly provided to Harrison Taylor.

ANALYSIS

For the reasons that follow, the Court **ADOPTS** the Government's lone objection [Doc. No. 338], **OVERRULES** Dr. Castro's objections [Doc. No. 347], and **HOLDS** that Dr. Castro's sentencing guidelines in the PSR are properly calculated as between 168 and 210 months

I. <u>Dr. Castro's Objections to his Sentencing Guideline Calculations [Doc. No. 347]</u>.

Dr. Castro raises seven individual objections to the calculation of his sentencing guidelines[2] [Doc. No. 347]. The Court finds that none of these arguments ultimately have merit, and therefore **OVERRULES** Dr. Castro's objections to his sentencing guideline calculations [Doc. No. 347].

    A. <u>Paragraphs 8-16 and Dr. Castro's Offense Conduct</u>.

Dr. Castro objects to ¶8's statement that he "wilfully conspired with others to commit health care fraud, in violation of 18 U.S.C. § 1349." "Dr. Castro maintains that he did not 'wilfully' conspire with others to commit health care fraud or to launder proceeds of that fraud." [Def.'s Br., Doc. No. 347, p.7]. Dr. Castro also further argues that co-defendant Shafiulla Hanif admitted to forging Dr. Castro's name on certain documents, that Dr. Castro did not write "thousands" of prescriptions for a variety of "powerful" drugs, and further disputes the Government's statements that the "vast majority" of patients were not actually seen by Dr. Castro. *Id*. at p.8. Dr. Castro also denies knowing that checks he received from co-defendant Shuresh Chand were derived from the proceeds of the scheme, and objects to the contention in

---

[2] Dr. Castro also argues that the Presentence Investigation Report also miscalculates his net worth as a positive number, rather than as a negative number. The Court agrees that this appears to be a typographical error in the Presentence Investigation Report, though this objection has no bearing on the guidelines calculation.

¶16 of the Presentence Report that Dr. Castro profited "substantially" from this scheme. *Id*.

Notwithstanding Dr. Castro's continued profession of innocence, the jury found Dr. Castro guilty of this conduct, and Dr. Castro's arguments to the contrary now are without merit.

B. <u>Dr. Castro's Objection to ¶18 and ¶23's Loss Calculations</u>.

Without further explanation, Dr. Castro "objects to and contests the amounts stated as attributable to him" [Doc. No. 347, p.9] in ¶18 of the PSR, which calculated that Medicare suffered a loss of $9,491,688.75, and that Blue Cross and Blue Shield of Michigan suffered a loss of $422,218.00 as a result of the health care fraud conspiracy. As the jury heard evidence substantiating these amounts during the trial, and as the jury convicted Dr. Castro of the conduct underlying these losses, Dr. Castro's arguments to the contrary are without merit.

Dr. Castro further argues, pursuant to ¶23 of the PSR as follows:

> . . . Dr. Castro submits that any "loss" attributable to him cannot be reasonably determined without gross speculation. He accordingly asks that any enhancement pursuant to U.S.S.G. § 2B1.1(b)(1) be based on any gain the Government can show that he actually received, as provided by Application Note 3(B). Further, since there can be no dispute that Dr. Castro did provide services, the loss should be reduced by the value of those services. See, U.S.S.G. § 2B1.1 n.3(E)(i).

[Doc. No. 347, p.9].

Application Note 3 to § 2B1.1 states, however, that "the court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss but it reasonably cannot be determined*." USSG § 2B1.1, comment. (n. 3) (emphasis added). Here, as discussed above, the loss attributable to the conspiracy participated in by Dr. Castro *is reasonably able to be determined*. Application Note 3(B) is therefore not applicable to Dr. Castro in this case.

Further, Dr. Castro's reliance upon Application Note 3(E)(i) is similarly misplaced. That

provision provides that loss "shall be reduced by the following:"

> The money returned, *and the fair market value of property returned and the services rendered, by the defendant* or other persons acting jointly with the defendant, *to the victim* before the offense was detected.

USSG § 2B1.1, comment. (n. 3(E)(i)) (emphasis added). In this case, however, Dr. Castro provided no services *to either Medicare or to Blue Cross Blue Shield of Michigan*. Dr. Castro's arguments to the contrary are without merit.

C. <u>Dr. Castro's Objection to ¶24's "Sophisticated Means" Guideline</u>.

Dr. Castro objects to ¶24 of the PSR's conclusion that he used "sophisticated means" with respect to the offense as provided by § 2B1.1(b)(9)(C). [*See* Doc. No. 347, p.9]. Relying on several examples given in the Application Notes for that guideline, Dr. Castro generally argues that the "sophisticated means" enhancement should not apply to him. *Id*.

The Comments to § 2B1.1 shed further light on the meaning behind the "sophisticated means" enhancement:

> For purposes of subsection (b)(9)(C), "sophisticated means" means especially complex or especially intricate offense conduct, pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1, comment. (n. 8). Further, "[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme" for purposes of § 2B1.1. *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005), citing *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).

In this case, the jury found Dr. Castro guilty of conspiracy to commit health care fraud,

after hearing evidence that, over multiple years, Dr. Castro prescribed drugs for patients he had not examined, and ordered physical and occupational therapy for patients which was not medically necessary. Further, the application of the "sophisticated means" guideline enhancement in a health care fraud conspiracy of similar sophistication was upheld by the Eleventh Circuit in *United States v. Carrazana*, 2010 WL 292994 (11th Cir. Jan. 27, 2010). On these facts, the Court holds that the "sophisticated means" enhancement of § 2B1.1(b)(9)(C) applies to Dr. Castro in this matter.

> D. Dr. Castro's Objection to ¶25's "Conscious Risk of Death or Serious Bodily Harm Guideline.

Dr. Castro objects to ¶25 of the PSR's conclusion that his offense involved a conscious or reckless risk of death or serious bodily harm pursuant to USSG § 2B1.1(b)(13)(A). Dr. Castro's argument is as follows:

> There is no allegation that anyone died or was seriously harmed as a result of Chand's scheme. Now has there been any substantive proofs offered to support the proposition that anyone was "at risk."

[Doc. No. 347, p.9]. As the Eleventh Circuit held in *United States v. Snyder*, 291 F.3d 1291, 1294-95 (11 Cir. 2002), "[t]he Guidelines, however, do not require that the victim actually suffer serious bodily injury. Rather, the question is whether the defendant placed the victim at such a risk." In another health care fraud conspiracy case, *United States v. Achille*, 2008 WL 2003182, *2 (11th Cir. May 12, 2008), the Eleventh Circuit specifically noted that the dispensing of medically unnecessary prescription medications to third parties created just such a risk of serious bodily harm under § 2B1.1(b)(13)(A). Dr. Castro's arguments to the contrary are without merit.

9

E. <u>Dr. Castro's Objection to ¶27's "Manager or Supervisor" Guideline</u>.

Dr. Castro objects to ¶27 of the PSR's conclusion that he was a "manager or supervisor" of the health care fraud conspiracy pursuant to USSG § 3B1.1. [Doc. No. 347, p.9]. That provision states as follows, in pertinent part:

> If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

USSG § 3B1.1(b). Subsection (a), which pertains to the "organizers and leaders" specifically omitted from subsection (b), provides for a four-level increase in offense level. USSG § 3B1.1(a).

In support of his arguments, Dr. Castro states that "there can be no dispute that Mr. Chand (and several of the fugitive defendants) were the ones who profited." [Doc. No. 347, p.9]. While certainly true that *others* in the health care fraud conspiracy profited from their endeavors, the jury also heard testimony that Dr. Castro profited significantly from his involvement as well. *See* USSG § 3B1.1, background. On these facts, the Court will apply the "manager or supervisor" guideline in USSG § 3B1.1(b), and Dr. Castro's arguments to the contrary are without merit. As § 3B1.1(b)'s guideline enhancement applies, Dr. Castro's argument for a reduction based on his minor participation under § 3B1.2 is likewise without merit.

F. <u>Dr. Castro's Objection to ¶28's "Abuse of a Position of Trust" Guideline</u>.

Dr. Castro objects to ¶28 of the PSR's conclusion that he abused a position of trust pursuant to USSG § 3B1.3. His argument is as follows:

> In order for § 3B1.3 to apply, the position of trust or special skill must have "significantly facilitated" the commission or concealment of the offense. In this case, Mr. Chand would have continued his scheme with or without Dr. Castro.

[Doc. No. 347, p.10]. The Court disagrees.

The jury heard testimony from co-defendant Shuresh Chand that Dr. Castro played an integral role in the health care fraud conspiracy - "significantly facilitated" through Dr. Castro's signing countless forms used to reverse-engineer fraudulent patient therapy files, through Dr. Castro's referring of fictitious patients to Mr. Chand for physical or occupational therapy that was not medically necessary, and through Dr. Castro compensating those fictitious patients, in part, through his writing prescriptions for powerful controlled substances in the patient's names. Regardless of whether co-defendant Shuresh Chand *may have tried to continue the scheme* without Dr. Castro's assistance, Dr. Castro played an integral role in the health care fraud conspiracy which "significantly facilitated" its commission. USSG § 3B1.3's enhancement for an "abuse of a position of trust," is therefore warranted in this case, and Dr. Castro's arguments to the contrary are without merit.

### G. Dr. Castro's Objection to ¶31's Money Laundering Conspiracy Offense Guidelines.

Dr. Castro objects to ¶31 of the PSR's calculation of the offense level associated with his money laundering conspiracy conviction. His argument is as follows:

> To the extent that the Base Offense Level is determined by the offense level for the underlying offense, Dr. Castro preserves his objections with respect to the Specific Offense Characteristic and Role in the Offense adjustments calculated as to Counts 1 through 12, being: the loss amount; sophisticated means; conscious or reckless risk of death or serious bodily harm; and, the adjustment based on the proposition that he was a "manager or supervisor" of the scheme.

[Doc. No. 347, p.10]. Thus, Dr. Castro's arguments regarding his money laundering conspiracy offense guidelines are contingent upon the success of his arguments discussed *supra*. As the

Court rejects his other arguments discussed *supra*, Dr. Castro's arguments regarding his money laundering offense are similarly without merit.

> II. The Government's Objection to Dr. Castro's Sentencing Guideline Calculations [Doc. No. 338].

In its sentencing memorandum [Doc. No. 338], the Government argues that Dr. Castro is subject to the two-level sentencing enhancement for abusing a position of trust pursuant to § 3B1.2 of the Sentencing Guidelines. [*See* Doc. No. 338, pp.12-14]. While the Probation Department's original PSR did not include this two-level enhancement, the revised PSR - issued on June 22, 2010, one day after the Government's sentencing memorandum was filed - did include this two-level enhancement.

As discussed *supra*, the Court holds that Dr. Castro is properly subjected to the two-level enhancement for abusing a position of trust pursuant to § 3B1.2 of the Sentencing Guidelines. The Court therefore **GRANTS** the Government's lone objection to the calculation of Dr. Castro's sentencing guidelines [Doc. No. 338] to the extent that this objection still remains unresolved.

> III. Calculation of Dr. Castro's Sentencing Guidelines in this Matter.

In light of the sentencing guideline objections resolved *supra*, the Court **HOLDS** that Dr. Castro's total offense level for his pending sentencing is thirty-five (35), with a corresponding criminal history category of I for Dr. Castro. Dr. Castro's sentencing guidelines for his pending sentencing hearing are therefore calculated at between 168 and 210 months, and Dr. Castro's arguments to the contrary are without merit.

CONCLUSION

For the reasons explained above, the Court **ADOPTS** the Government's lone objection [Doc. No. 338], **OVERRULES** Dr. Castro's objections [Doc. No. 347], and **HOLDS** that Dr. Castro's sentencing guidelines in the PSR are properly calculated as between 168 and 210 months.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 18, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 18, 2010, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager